Judge Owsley
delivered the opinion of the court.
This is a contest for land under adverse conflicting claims.
By a decision of the circuit court, Finlay was decreed to surrender his legal title derived under an entry of prior date to that under which Granger claims.
Reliance appears not to have been made by Finlay upon the validity of his entry; but if it had, there is nothing in the record upon which, according to the most benign construction, the entry could be sustained.
In reviewing the decree of that court, therefore, our attention will be confined, principally, to the entry under which Granger, the complainant there, asserted the superior equity. It is as follows:—
“December 16, 1783—John Rogers enters 68,728 1/2 acres “of land, upon seven treasury warrants, No. &c. on the wa"ters of Nolin, waters of Green river, to lie joining an en-"try of Jacob Vanmeter and Gill, opposite the mouth of “Valley creek, and south from the same; running thence “south, binding on Larue’s entry of 6000 acres to the south “east corner; also from the said beginning cast, with Van-“meter’s lines to William May’s entry of 400 acres, con-"tinuing up the creek, binding on Henry Funk’s survey, of “500 acres; also on Philips’entry of 400 acres, to the up-“per corner; thence off south so far that a line from the “end of the said line west will include the quantity.”
The first object to which the attention of those who might be desirous of ascertaining the land embraced by this entry would be drawn, is the entry of Vanmeter and *176 Gill, But on searching the book of entries, the enquirer would be unable to find an entry in the names of those persons; he would discover, however, that, on the 10th of November, 1783, prior to the date of Rogers’ entry, Samuel Gill made an entry of 1000 acres "on the south west or up-"per side of Nolin, to begin on Nolin opposite the mouth of “Valley creek; thence up the creek 600 poles; thence off “at right angles from the said creek south-westwardly for “for quantity.”
Having found the entry of Gill, and pursuing that, in accordance to the description contained in the entry of Rogers, it lies “on Nolin, opposite the mouth of Valley creek," the enquirer could entertain no reasonable doubt, but that it should be adjoined by the entry of Rogers.
And as Nolin and the mouth of Valley creek are proven to have been generally known at the date of Gill’s entry, there could be no difficulty in ascertaining its position by a survey beginning on Nolin, opposite the mouth of Valley creek, and running up Nolin, with its meanders, 600 poles when reduced to a straight line, and thence off at right angles to the general course of the creek, so far that a line parallel to the general course of the creek, and a line at right angles thereto, from the beginning, will include the quantity.
Having ascertained the position of Gill’s entry, the enquirer would naturally conclude that Rogers’ entry should adjoin it upon the line opposite, and parallel to the general course of Nolin, but at what point upon that line Rogers should begin his entry, is certainly not as clear as it might have been made, and as respects the present contest, as the effect would be the same to begin on any part of the line, is not material to decide. We think, however, that from the call to run from the beginning east with Vanmeter’s line, the locator most probably intended Gill’s south-eastern corner should form the beginning of Rogers’.
In proceeding from the beginning with the calls of Rogers’ entry, the next object that arrest the attention is Larue’s entry of 6000 acres. It is in the following words:
"3d February, 1783—John Larue enters 6000 acres, “&c. joining his 1000 acre tract on Nolin, on every vacant “side—beginning on his south east corner; thence South, “thence east so far as right angles shall include the quanti-"ty of vacant land fit for cultivation."
“On the 7th October, 1780, John Larue entered 1000 *177 acres, about eight or nine miles below Summers’ Valley creek, beginning at the mouth of Sandy creek, running up Nolin creek one mile, and up said creek one mile, and thence east and north for quantity.”
Sandy creek is not proven to have possessed notoriety at the date of this entry, but a creek of that name running into Nolin about nine miles below Valley creek, is delineated upon the plat, and as no other creek calculated to deceive, is shewn; an enquirer, by the exercise of ordinary diligence, and pursuing the direction contained in the entry, would be conducted with sufficient certainty to the land embraced by the location.
The 1000 acre entry should be surveyed by lines extended up Nolin with its meanders one mile from the mouth of Sandy creek, when reduced to a straight line, and up Sandy creek from its mouth, with its meanders, one mile, when reduced to a straight line; and from the termination of the distance on Sandy creek, a line should be extended east so far that a line north would include the quantity, by intersecting a line extended east from the termination of the distance on Nolin.
A survey thus made would present a south east corner, at which Larue’s 6000 acre entry should begin.
The 6000 acre entry should be surveyed in a square, with a line extended south so far that a line east, and other lines at right angles, will include the quantity.
By this mode of laying down the 6000 acres, we are aware, that the call “adjoining his 1000 acre tract on every vacant side,” will have no operation; but that call is evidently vague and indefinite, and should not control other express calls, or tend to destroy an entry containing a precise and certain location.
From Rogers’ beginning, therefore, a direct line should be extended to the north east corner of Larue’s 6000 acre entry, and from thence with Larue’s line to his south east corner. By thus extending the line from Rogers’ beginning, there will be a slight departure from the course called for in his entry; but that departure is made unavoidable by the call for Larue, and there is no other rational mode of extending that line by which to comply so aptly with the call, “binding on Larue to his south east corner.”
Pursuing the calls of Rogers, in the order contained in his entry, the next objects to which the attention is drawn *178 are William May’s entry of 400 acres, and Henry Funk's survey of 500 acres.
An entry calling for Jacob Funk's entry will be construed to join Henry Funk's, if there be no entry in the name of Jacob,and Henry’s calls corresponding with the entry calling to adjoin it.
An entry calling for another, which is vague, partakes of the vagueness of the other to every possible extent;—but for land not within the influence of that uncertainty, it may be good.
May’s entry is as follows:—“10th April, 1783—William “May enters 400 acres, &c. adjoining Jacob Funk’s entry “of 500 acres, about two or three miles below the mouth of “Middle creek, on the lower side, to run out on both sides “of the creek and down the same for quantity.”
Prior to the date of this entry, and on the 16th March, 1781, Henry Funk entered 500 acres, “on Nolin creek, a"bout two or three miles below the mouth of Middle creeks “beginning ten poles below a spring on the north side of “Nolin, at which is a red-oak tree marked I. F; thence up “the creek on the north side to about where a branch comes “in on the opposite side; thence crossing the creek and “running up along the south side of a branch to the edge “of the barrens above, then running eastwardly, crossing “the branch to the edge of the barrens; thence with the “same to the point dividing the bottom on the branch, from “the bottom on Nolin; thence up along the foot of the hill “to the barrens; thence northwardly across Nolin for quantity."
This entry, it will be perceived, is in the name of Henry Funk, and not Jacob Funk, as described in May’s entry; but a subsequent locator, not finding any entry in the name of Jacob Funk, and perceiving from the calls of that in the name of Henry, that it lies on Nolin about two or three miles below the mouth of Middle creek, would naturally conclude that the entry of May should adjoin that of Henry Funk on the lower side.
Having ascertained that May’s entry adjoins Funk's below, for the purpose of learning the position of the former, the subsequent locator would be led to enquire for the land embraced by the latter.
And by pursuing his enquiry, he would readily arrive at the land claimed by Funk, and from the notoriety of Funk’s claim, could have had little difficulty in finding the boundary of Funk's survey; but by the most diligent and attentive enquiry, he would have been unable to ascertain with precision and certainty the position of Funk's location.
By adverting to the entry of Rogers, however, the enquirer would perceive that May’s entry is described to lie below Funk's survey; but as May’s entry calls for Funk's entry, from the uncertainty of the latter, the enquirer would have been unable to ascertain the position of the former.
An entry calling for the lines of a survey neither recorded or notorious, is invalid, tho' the claim on which the survey was made may have been notorious.
Within the range of any possible effect, therefore, which the uncertainty in May’s entry can produce on Rogers’ location, the entry of Rogers must also be considered vague and uncertain; but for land not within the influence of that uncertainty, the entry of Rogers may, nevertheless, be valid; and as both Funk’s and May’s entries must lie on Nolin below the mouth of Middle creek, let them assume any possible position, it is obvious, that to adjoin May can produce no effect upon the entry of Rogers, as respects the land now in contest, if the other calls in his location are sufficiently established.
In pursuing the calls of Rogers, the next object demanding notice, is, the 400 acre entry of Philips.
That entry was made the 6th October, 1783, and calls "to lie on Nolin, and to join Jacob Linder’s 200 acre entry "on the lower side, and extending down Nolin on both sides "till it joins John Paul’s 150 acre entry.”
On the 10th September, 1783, Jacob Linder entered 200 acres, “adjoining Montgomery’s survey of 2000 acres on "Nolin, at the mouth of Middle creek, beginning on his "line on the north side of the creek, 70 poles therefrom; "thence running with his line southwardly across the creek, "70 poles, thence down the creek parallel thereto, to in-"clude the quantity.”
On the 8th August, 1781, John Paul entered 150 acres on Nolin creek, “beginning at a spring near the mouth of “a branch, about one mile above Funk’s spring on the north "side of said creek, and extending up the said branch and "the main creek for quantity.”
It will be perceived that Philips’ entry must lie on Nolin, between and adjoining Linder and Paul; and that Linder’s entry must adjoin Montgomery’s survey, and extend down Nolin, with lines parallel thereto, for quantity.
In order to ascertain the upper corner of Philips, therefore, the enquirer would be naturally led to search for the survey of Montgomery, called for in the entry of Linder.
A survey of 2000 acres is proven to have been made for Montgomery, by John Handly, prior to the date of Linder’s entry; but the survey is not shewn to have been of record, and from the evidence in the cause, it is extremely questionable whether, by the most vigilant search, an enquirer could have ascertained its boundary.
In 1780, Montgomery appears to have entered 2000 acres, including the mouth of Middle creek, and his claim *180 is proven to have obtained general notoriety at the date of Linder's survey; and several witnesses, whose depositions are taken in this cause, speak of their having no doubt but that Montgomery's survey might have been then easily found; but from the phraseology of the depositions, it is most probable the opinion of those witnesses resulted more from the notoriety of Montgomery's claim, than from any knowledge they had of his survey.
The surveyor’s report is evidence of any fact and of any natural or artificial object, but is not evidence that a certain figure in the connected plat represents a given survey.
If they intended to be understood as proving the notoriety of the survey, it is strange they have failed to point out with any thing like tolerable precision, where it could be found.
Those witnesses have not only failed to identify either line or corner of the survey, but they have not even told us whether there was ever any actual demarkation of boundary on the land, and have given no information in relation to its boundary, except that contained in the field notes taken by Handly at the making of the survey, and attached to one of his depositions.
We are told by one witness, that the survey made by Handly included the mouth of Middle creek; but in what part of the survey it was included—whether it was in the centre, or approximated either line or corner, he is altogether silent, and those facts are left entirely to conjecture.
It is true, upon the connected plat the surveyor has delineated the figure of a survey, including the mouth of Middle creek, which he reports, represents Montgomery's survey; but that report is no evidence of the survey made for Montgomery by Handly being embraced by the figure delineated upon the plat. The surveyor’s report would, no doubt, be competent evidence of the existence of any natural or artificial objects reported to be upon the ground, but a report, such as that in the present case, barely suggesting that a figure delineated upon the plat represents a particular survey, cannot, according to any rule of evidence, be admitted to prove either the existence or identity of such survey.
And with respect to the field notes of Handly, whilst they are admitted to contain a description of the survey being made to begin at two white oaks, about thirty poles southwardly from Funk's spring, we are unable to learn, from any thing contained in the record, where these white oaks are to be found.
“There is, however, sufficient in the record to shew that *181 Funk’s spring is some where within the limits of his survey, and by commencing Montgomery’s survey at any point within the range of a southwardly direction from the spring, or at any other conceivable point, and extending the lines according to the field notes, it is plain, that the figure reported by the surveyor, as representing Montgomery’s survey, and contended for as such by the appellee, cannot be the same that was made by Handly.
Littell for appellants, B. Hardin for appellee.
Under these circumstances we cannot suppose that the survey of Montgomery possessed such a degree of notoriety at the date of Linder’s entry as could have enabled a subsequent locator, with reasonable diligence, to have found it.
If it be said, that from the description contained in Montgomery’s entry, and the notoriety of his claim, the subsequent locator would have been conducted to the survey—it is answered—that no marked boundary is proven to have existed upon Montgomery’s claim, and the position which the survey made by Handly, actually assumed, is not shewn.
But if the survey could have been found, judging from the description contained in the field notes of Handly, it is obvious, that Philips’ entry calling for Paul below and Linder above, cannot be sustained.
For, by laying down Linder’s entry on Nolin below, and adjoining a survey beginning a southwardly direction from Funk’s spring, it would assume a position utterly impossible for Philips to adjoin below, and to extend down the creek to adjoin Paul.
Philips’ entry, therefore, being invalid, it follows, that Rogers, by calling for his upper corner, and to extend south for quantity, cannot be sustained.
The decree of the court below must, consequently, be reversed with cost, the cause remanded to that court, and the bill dismissed with cost.